

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: March 30, 2022.**

_____
**CRAIG A. GARGOTTA**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § § § | CASE NO. 20-50369-cag |
| DALF ENERGY, LLC, | § § | CHAPTER 11 |
| Debtor. | § | |

| | | |
|---|---|---|
| TITANURBI21, LLC et al., Plaintiffs. | § § § § | ADVERSARY NO. 20-05054-cag |
| v. | § § | |
| GS OILFIELD SERVICES, LLC et al., Defendants. | § § | |

**MEMORANDUM OPINION ON PETERSON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 66) AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST SUOCO OIL COPRORATION, JONA DANIELS SMITH, MARILYN CRAFTON, AND PATRICIA PETERSON, AS THE INDEPENDENT EXECUTOR OF THE ESTATE OF BARRY PETERSON (ECF NO. 74)**

Came on for consideration the above-numbered adversary proceeding and, in particular,

two summary judgment motions and responsive pleadings. The first set is Peterson Defendants' Motion for Summary Judgment (ECF No. 66)[1], Peterson Defendants' Brief in Support of Motion for Summary Judgment (ECF No. 67) ("Peterson MSJ"), Plaintiffs' Response to Peterson Defendants' Motion for Summary Judgment and Their Brief in Support of Same (ECF No. 106), and Peterson Defendants' Reply to Plaintiffs' Response to Peterson Defendants' Motion for Summary Judgment and Brief in Support (ECF No. 111). The second set is Plaintiffs' Motion for Summary Judgment against Suoco Oil Corporation, Jona Daniels Smith, Marilyn Crafton, and Patricia Peterson, as the Independent Executor of the Estate of Barry Peterson (ECF No. 74) ("Plaintiffs' MSJ"), Peterson Defendants' Response to Plaintiffs' Motion for Summary Judgment against Suoco Oil Corporation, Jona Daniels Smith, Marilyn Crafton, and Patricia Peterson, as the Independent Executor of the Estate of Barry Peterson (ECF No. 103), and Plaintiffs' Reply Brief in Support of Their Motion for Summary Judgment Against the Peterson Defendants (ECF No. 117). After a hearing on August 25, 2021, the Court took the Peterson MSJ and Plaintiffs' MSJ under advisement.[2]

For the reasons stated herein, the Court finds that the Plaintiffs' MSJ should be GRANTED IN PART and DENIED IN PART and Peterson MSJ should be GRANTED IN PART and DENIED IN PART.

## JURISDICTION

As an initial matter, the Court finds it has jurisdiction over this matter under 28 U.S.C. §§ 1334 (a) and (b).  Venue is proper under 28 U.S.C. §§ 1408 and 1409. The bankruptcy court

---

[1] "ECF" denotes the electronic filing number. By way of background, the operative Complaint at issue was filed in Adversary No. 20-05049-cag, *DALF Energy, LLC and TitanUrbi21, LLC v. GS Oilfield Services, LLC et al*. The Court consolidated Adversary No. 20-05049 with this Adversary No.20-05054 on January 12, 2021. (ECF No. 32 in Adversary No. 20-05054). Unless otherwise noted, all ECF references are to Adversary No. 20-05054.

[2] At the hearing on August 25, 2021, the parties made oral argument on additional dispositive motions that are not addressed in this opinion. This opinion addresses only the Court's ruling on the Plaintiffs' MSJ (ECF No. 74) and Peterson MSJ (ECF No. 67).

has authority to adjudicate this matter pursuant to the District Court's Standing Order of Reference. Plaintiffs have consented to this Court's authority to enter a final order. (Case No. 20-05049, ECF No. 19). Defendants consented to a magistrate judge's authority to conduct a trial. (Case No. 20-05049, ECF No. 35).

## BACKGROUND

TitanUrbi21, LLC ("TU") is a self-described "investment company" that holds oil and gas interests. (ECF No. 67, Ex. A, ¶¶ 35, 38). TU also owns two entities—DALF and Titan Vac & Flow, LLC ("Titan"). (ECF No. 67, Ex. A, ¶ 35). DALF was the sole operator of TU's oil and gas leases. (*Id*.). Titan provided vacuum truck and managerial services for DALF's operations. (*Id*.).

DALF sought to invest in oil and gas leases in Texas. (*Id*. at ¶ 36). In or around October 2015, DALF was introduced to Jeffrey R. Scribner ("Scribner"). (*Id*.). According to DALF, Scribner represented himself as a petroleum engineer who was "the 'best' in evaluating oil and gas properties due to his prior work at Marathon Oil Company and other energy companies." (*Id*.). DALF contends Scribner represented that he obtained Bachelor of Science degrees in Petroleum Engineering, Chemistry, and Physics from Texas Tech University, where he allegedly graduated "best in his class." (*Id*.). DALF retained Scribner as "an independent contractor and its agent" "to locate and analyze potential oil and gas investment opportunities and to operate and maintain the oil and gas wells." (*Id*. at ¶ 37). After being retained by DALF at some time in 2015 or 2016, Scribner entered into a number of transactions to purchase oil and gas interests on behalf of TU. (*Id*.).

The transaction at issue in this set of summary judgment motions[3] is the sale of Texas oil and gas leases ("Peterson Transaction") to TU from Suoco Oil Corporation ("Suoco") and Daniels

---

[3] Other parties and Plaintiffs filed various other motions for summary judgment at ECF Nos. 64, 68, 69, 71, 72, 73, 75, 76, and 78. The Court will address those motions in separate orders.

Family Energy, LP ("Daniels Energy"). Barry Peterson[4] ("Barry"), Jona Daniels Smith ("Jona"), and Marilyn Crafton ("Marilyn") (collectively "Peterson Siblings") are principals of Suoco and Daniels Energy. BMJ Energy, Inc. is also a named defendant. Plaintiffs only seek summary judgment against Suoco and the Peterson Siblings, so the Court will refer to Suoco, Barry's estate, Jona, and Marilyn as the "Peterson Defendants."

J.C. Daniels and Joni Daniels, (step-)parents of Peterson Siblings, acquired various oil and gas interests over their lives. (ECF No. 67, Ex. B, at 1). J.C. Daniels and Joni Daniels were the only partners of Daniels Energy; they also were the sole stockholders of Suoco. (*Id.*). Suoco and Daniels held the interests conveyed in the Peterson Transaction. (*Id.*). The Peterson Siblings inherited the oil and gas leases and the Suoco stock from the estates of their parents. (*Id.* at 2). Barry is Secretary and Treasurer of Suoco. (ECF No. 67, Ex. E, 106:13–14). None of the Peterson Defendants are registered under the Texas Securities Act.

After the deaths of their parents, the Peterson Siblings continued to operate Suoco and Daniels Energy through the estates of their parents. (ECF No. 67, Ex. B, at 1). Various individuals and entities approached the Peterson Defendants about purchasing the assets of the two businesses, but those sales were never closed. (ECF No. 67, Ex. E, 19:5–10).

Scribner initiated all contact with the Peterson Defendants when he phoned Barry on February 14, 2017. (ECF No. 67, Ex. E., 19:11–25). Scribner previously contacted a relative of the Petersons who said the Peterson Defendants might be interested in selling oil and gas leases and put Scribner in contact with Barry. (*Id.*). Scribner then asked Barry if the Peterson Defendants would sell their oil and gas leases and if he and Barry agree to terms of sale. (*Id.*). Scribner told Barry "he was a representative of TITANURBI, and that he was — he was in the process of trying

---

[4] The Estate of Barry D. Peterson, deceased, is a named defendant in the suit. Patricia Peterson is the Independent Executor of the Estate of Barry D. Peterson. When discussed as a defendant, references to Barry are to his estate.

to purchase production for that entity in the Texas panhandle." (ECF No. 67, 20:10–17). During this phone call, Scribner told Peterson he was aware of the Peterson Defendant's leases and assets after reviewing them on the Railroad Commission website. (ECF No. 67, Ex. E, 22:8–25). Scribner identified himself as a petroleum engineer and a representative of DALF. (*Id.*). Scribner also bragged to Barry that he could increase production on the wells. (*Id.*).

Barry and Scribner then agreed on a purchase price of $650,000 for both Suoco and Daniels Energy and all the assets owned by both entities. (ECF No. 67, Ex. E, 23:3–7). Scribner then conferred with Garza, the owner of DALF, and Carlos Sada Solano Sr. ("Carlos Sr."), the then-owner and managing member of TU, to make the final decision to purchase the leases. (ECF No. 67, Ex. I, 55:7–58:3).

Scribner emailed Barry on February 16, 2017 stating Carlos Sr. had agreed to Oil & Gas Holdings, LLC ("Oil & Gas Holdings") retaining an overriding royalty interest. (ECF No. 67, Ex. E, 33:1–6). Though Scribner testified he informed Carlos Sr. of the overriding royalty interests, Scribner also admits he did not inform Carlos Sr. that he owned Oil & Gas Holdings. (ECF No. 67, Ex. I, 59:9–23). Scribner then told Barry to write an overriding royalty interest retained by Oil & Gas Holdings into the assignments Barry was preparing. (*Id.*).

The following day, Scribner emailed Barry requesting "paperwork." (ECF No. 67, Ex. E, 27:2–11). Barry began to prepare a buy-sell agreement the next day. (ECF No. 67, Ex. E, 27:21–25). A few days later, Scribner sent Barry copies of two recent assignments as a guide. (ECF No. 67, Ex. E, 28:15–19).

On closing day, February 21, 2017, Scribner called Barry multiple times with additional changes to the buy-sell agreement. (ECF No. 67, Ex. E, 30:17–31:23). Scribner and Barry intended to close the sale at the Martindale law office in Pampa, Texas, but the office was full, so they

5

closed the sale at the Gray County Courthouse instead. (ECF No. 67, Ex. E, 31:22–32:3, 44:15–45:2). Barry prepared multiple assignments because an accountant made him aware that Suoco held some of the leases while Daniels Energy held others. (ECF No. 67, Ex. E, 43:10–18). Barry included Jona and Marilyn on the assignments to avoid any confusion about whether all the ownership interests in the Peterson Defendant's leases were transferred. (ECF No. 67, Ex. E, 9–19). After confirming that Scribner had wired the sale price of $650,000 (ECF No. 67, Ex. E, 46:21–47:3), Barry and Scribner signed the assignments and the latest buy-sell agreement ("Buy-Sell Agreement"), (ECF No. 67, Ex. E, 45:9–21). The Buy-Sell Agreement still needed one correction, which Scribner said he would make. (*Id*.). Scribner left with the assignments and the Buy-Sell Agreement. (*Id*.). Carlos Sr. later signed the Buy-Sell Agreement (ECF No. 67, Ex. D, at 7). The Buy-Sell Agreement includes all stock in Suoco and Daniels Energy. (*Id*. at 2). After closing, Scribner contacted Barry to inform him that some of the leases were missing from the assignments, so Barry prepared subsequent assignments. (ECF No. 67, Ex. E, 77:15–25). None of the securities conveyed in the Peterson Transaction were registered under the Texas Securities Act.

On July 5, 2017, TU, DALF, and Titan filed a lawsuit against Scribner and Hector Fino in the 23rd Judicial District Court of Gray County, Texas ("State Court Lawsuit"). Plaintiffs amended the petition in their State Court Lawsuit on December 22, 2017, to add causes of action against a number of additional defendants from whom TU purchased oil and gas interests, including a claim against the Peterson Defendants that seeks recission of the Peterson Transaction for violation of the Texas Securities Act ("TSA") based upon the sale of unregistered securities. TU filed motions for summary judgment in the State Court Lawsuit—including a motion for summary judgment against the Peterson Defendants[5]—seeking a determination on the issue of liability under the TSA.

---

[5] Plaintiffs' MSJ only seeks summary judgment against Suoco, Jona, Marilyn, and the Estate of Barry Peterson.

Thereafter, the State Court Lawsuit was removed to this Court after DALF filed its chapter 11 petition.

## ALLEGATIONS

At issue in both Plaintiffs' MSJ and the Peterson MSJ is whether the Peterson Transaction is an exempt transaction under the TSA. Both parties acknowledge the securities sold from the Peterson Defendants to TU were not registered under the TSA. The Peterson Defendants, however, contend their assignments of oil and gas interests are exempt under Tex. Rev. Civ. Stat. Ann. art. 581-5 §§ C, Q, I, and section 109.14(d) of the Texas Administrative Code. Conversely, TU argues the alleged exemptions are inapplicable. TU seeks a declaratory judgment finding that the Peterson Defendants sold TU interests in oil and gas leases in violation of the TSA. Additionally, TU requests that the amounts of consideration paid to the Peterson Defendants for the lease interests, plus interest thereon from the date of transactions, be awarded to TU. Finally, TU and DALF seek a declaration that the Peterson Defendants will be liable for any plugging or abandonment costs for the lease interests sold by the Peterson Defendants to TU.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Bankruptcy Rule 7056 applies Rule 56(c) of the Federal Rules of Civil Procedure to adversary proceedings. If summary judgment is appropriate, the Court may resolve the case as a matter of law. *Celotex Corp.*, 477 U.S. at 323; *Blackwell v. Barton*, 34 F.3d 298, 301 (5th Cir. 1994). The Fifth Circuit has stated "[t]he standard of review is not merely whether there is a sufficient factual dispute to

permit the case to go forward, but whether a rational trier of fact could find for the non-moving party based upon evidence before the court." *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

To the extent that the non-moving party asserts the existence of factual disputes, the evidence offered by the non-moving party to support those factual contentions must be of sufficient quality so that a rational fact finder might, at trial, find in favor of the non-moving party. *Matsushita*, 475 U.S. at 585–87 (1986) (non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts."); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) ("adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial."). If the record "taken as a whole, could not lead a rational trier of fact to find for the non-moving party, then there is no genuine issue for trial." *LeMaire v. Louisiana*, 480 F.3d 383, 390 (5th Cir. 2007).

In determining whether a genuine issue of material fact exists, the nonmoving party must respond to a proper motion for summary judgment with specific facts demonstrating that such genuine issue exists. "[A] genuine issue of material fact is not raised by mere conclusory allegations or bald assertions unsupported by specific facts." *Leon Chocron Publicidad Y Editoria, S.A. v. Jimmy Swaggart Ministries*, 990 F.2d 1253 (5th Cir. 1993) (citation omitted).

## ANALYSIS

As a general rule, any security sold in the State of Texas must be registered. Tex. Rev. Civ. Stat. Ann. art. 581-7(A)(1) (West 2021). An interest in an oil and gas lease is defined as a security by the TSA. *See Anderson v. Vinson Exploration, Inc.*, 832 S.W.2d 657, 662 (Tex. App. –El Paso 1992, writ denied) ("An assignment of an interest in an oil and gas lease is a 'security' as defined in Article 581-4 A of the Texas Securities Act."). The TSA exempts certain oil and gas securities

8

from registration. *See* Tex. Riv. Stat. Ann. art. 581-5 ("Except as hereinafter in this Act specifically provided, the provisions of this Act shall not apply to the sale of any security when made in any of the following transactions and under any of the following conditions . . . ."). In this case, Peterson Defendants sold TU oil and gas securities that were not registered.

TU and DALF allege the Peterson Defendants' sale of their oil and gas leases to TU constituted the sale of an unregistered security in violation of Section 7 of the TSA. *See* Tex. Rev. Civ. Stat. Ann. art. 581-33(A) ("A person who offers or sells a security in violation of Section 7 . . . of this Act is liable to the person buying the security from him, who may sue either at law or in equity for recission or for damages if the buyer no longer owns this security.") Section 7 of the TSA provides:

> No dealer or agent shall sell or offer for sale any securities issued after September 6, 1955, except those which shall have been registered by Notification under subsection B or by Coordination under subsection C of this Section 7 and except those which come within the classes enumerated in Section 5 or Section 6 of this Act, until the issuer of such securities or a dealer registered under the provisions of this Act shall have been granted a permit by the Commissioner . . . .

Tex. Rev. Civ. Stat. Ann. art. 581-7(A). Stated differently, Section 7 of the TSA provides, in relevant part, that a "dealer" or "agent" cannot sell a security without being granted a permit, unless the security is registered, or the security qualifies under one of the enumerated exemptions provided in Art. 581-5 of the TSA. *Id.* Specific exemptions are described in Section 5 of the TSA. Tex. Rev. Civ. Stat. Ann. art. 581-5(A)-(U). The party claiming the exemption under Section 5 of the TSA has the burden of proof in establishing the exemption. *See* Tex. Rev. Civ. Stat. Ann. art. 581-37 ("It shall not be necessary to negative any of the exemptions in this Act in any complaint, information or indictment, or any writ or proceeding laid or brought under this Act; and the burden of proof of any such exemption shall be upon the party claiming the same.") If a sale of a security occurred in an exempt transaction, then the provisions of the TSA that require registration with the

9

Texas State Securities Board do not apply to the sale of the security.

The Peterson MSJ contends the Peterson Transaction is exempt from the TSA under Tex. Rev. Civ. Stat. Ann. art. 581-5 §§ C(1), I, Q and section 109.14(d) of the Texas Administrative Code ("TAC").[6] The Court will address the applicability of each exemption to the Peterson Transaction in turn.

## A. Exemption for Isolated Transactions Under Art. 581-5 § (C)(1)

Art. 581-5(C)(1) provides that the following transaction is exempt from the Texas Securities Act:

> Sales of securities made by or on behalf of a vendor, whether by dealer or other agent, in the ordinary course of bona fide personal investment of the personal holdings of such vendor, or change in such investment, if such vendor is not engaged in the business of selling securities and the sale or sales are isolated transactions not made in the course of repeated and successive transactions of a like character; provided, that in no event shall such sales or offerings be exempt from the provisions of this Act when made or intended by the vendor or his agent, for the benefit, either directly or indirectly, of any company or corporation except the individual vendor (other than a usual commission to said agent), and provided further, that any person acting as agent for said vendor shall be registered pursuant to this Act [.]

Tex. Rev. Civ. Stat. Ann. art. 581-5(C)(1) (referred to hereinafter as "Art. 581-5(C)(1)"). The TSA does not define the term "vendor." Blacks Law Dictionary defines a vendor as "a seller, usually of real property." Black's Law Dictionary (11th ed. 2019). Moreover, there is no case law explaining what constitutes a sale "in the ordinary course of bona fide personal investment"; when a vendor is "not engaged in the business of selling securities"; or how to determine if "sales are isolated transactions not made in the course of repeated and successive transactions of a like character."

The Peterson Defendants contend their sale of oil and gas securities to TU was an exempt

---

[6] Tex. Rev. Civ. Stat. Ann. art. 581-5 §T ("Section 5.T") provides an exemption for "[s]uch other transactions or conditions as the board by rule, regulation, or order may define or prescribe, conditionally or unconditionally." Section 5.T allows movants to assert exemptions that are provided for by rules, regulations, or orders outside of the TSA, including the Texas Administrative Code.

10

transaction under Art. 581-5(C)(1) for three reasons. First, the Peterson Defendants argue the leases sold were a "personal investment" they received through their parents' wills. (ECF No. 67, ¶¶ 52–53). Second, the Peterson Defendants assert they were not "regularly engaged in the sale of oil and gas leases." (*Id.* at ¶ 41). The Peterson Defendants stress they never purchased additional oil and gas interests beyond those inherited. (*Id.* at ¶ 54). Instead, the purpose of their business was to operate oil and gas leases. (*Id.*). Third, the Peterson Defendants argue the sales were "isolated transactions" because they had not ever sold oil and gas interests prior to this transaction. (*Id.* at ¶¶ 55–56).

Plaintiffs' MSJ contends the Anderson Defendants do not qualify for the exemption under Art. 581-5(C)(1) because they fall within the statutory definition of a "dealer" with respect to the sale of the lease interests they owned. Moreover, Plaintiffs argue Barry, Jona, and Marilyn—who were not registered under the TSA—acted as agents for the Peterson Defendants in the transaction with TU.

Despite the dearth of case law applying the exemption under TSA 5(C)(1), the Court finds the repeated use of the word "personal" dispositive. *See* Tex. Rev. Civ. Stat. Ann. art. 581-5(C)(1) (referring to a sale of securities "in the ordinary course of bona fide personal investment of the personal holdings of such vendor . . . ."). The TSA defines the term "person," but does not define the word "personal." *See* Tex. Rev. Civ. Stat. Ann. art. 581-4(B) (stating, "[t]he terms 'person' and 'company' shall include a corporation, person, joint stock company, partnership, limited partnership, association, company . . . ."). The Court will not conflate the TSA-defined noun "person" with the undefined adjective "personal," which the Legislature uses repeatedly in the exemption.

"It is cardinal law in Texas that a court construes a statute, 'first, by looking to the plain

and common meaning of the statute's words.'" ***Fitzgerald v. Adv. Spine Fixation Sys., Inc.***, 996 S.W.2d 864, 865 (Tex. 1999) (citation omitted); *see also* Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 69 (2012) ("Words should be given 'their ordinary, everyday meanings,'" unless the lawmaking body has provided a specific definition, or "the context indicates they bear a technical sense."). Giving every word and phrase meaning is also cardinal to statutory interpretation. In Texas, courts are to "presume that the Legislature chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen." ***TGS-NOPEC Geophysical Co. v. Combs***, 340 S.W.3d 432, 439 (Tex. 2011); *see also* Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 174 (2012) ("If possible, every word and every provision is to be given effect . . . . None should be ignored.").

TSA 5(C)(1) emphasizes the personal nature of the holding(s), investment, and transaction. The transaction must be made "in the ordinary course of a bona fide *personal* investment of the *personal* holdings" of the vendor. Tex. Rev. Civ. Stat. Ann. art. 581-5(C)(1) (emphasis added). Because the TSA does not define "personal," the Court refers to the meaning of the word "personal" in Black's Law Dictionary. Black's Law Dictionary defines the adjective "personal" as "of or affecting a person," such as a personal injury, or "of or constituting personal property." Black's Law Dictionary (11th ed. 2019). The Court, therefore, concludes that the adjective "personal" describes something in relation to an individual. The Court will neither ignore the word "personal" nor its human connotation. Because of the human connotation of the word "personal," the Court concludes that a business entity cannot have personal investments or personal holdings. Therefore, the security at issue must be held by a human individual, and must be sold by a human individual, for the exemption to apply.

Here, neither party disputes that Suoco Oil Corporation held the oil and gas securities or that Suoco Oil Corporation conveyed the oil and gas security to TU. (ECF No. 67, Ex. G, at 1–5; ECF No. 67, Ex. H, at 1–4). Suoco Oil Corporation is not a human being. (ECF No. 67, ¶ 5). Suoco Oil Corporation cannot be protected by the exemption. The Court therefore GRANTS summary judgement on this exemption for the Plaintiffs and DENIES summary judgment on this exemption for the Defendants.

### B. Limited Offering Exemptions Under Art. 581-5 §§ (I)(a), (I)(c)

Article 581-5(I) ("TSA 5(I)") provides three exemptions for sales of securities by issuers that are for limited offerings. Tex. Rev. Civ. Stat. Ann. art 581-5(I). Initially, Peterson Defendants contended they qualify under two of those exemptions: Article 581-5(I)(a) and Article 581-5(I)(c). In Peterson Defendants' Response to Plaintiffs' Motion for Summary Judgment against Suoco Oil Corporation, Jona Daniels Smith, Marilyn Crafton, and Patricia Peterson, as the Independent Executor of the Estate of Barry Peterson (ECF No. 103), Peterson Defendants conceded the exemptions at TSA 5(I) do not apply because Peterson Defendants are not issuers. (ECF No. 103, ¶ 33). This concession appears to be in response to Plaintiffs' focus on the oil and gas securities. The Court, therefore, concludes that Plaintiffs' MSJ is GRANTED IN PART on these exemptions as to the oil and gas leases and Peterson MSJ is DENIED IN PART on these exemptions as to the oil and gas leases.

As a matter of law, however, common stock is a security as defined by TSA 581-4(A). The parties made no argument about whether the conveyance of the unregistered stocks was subject to the exemptions created by TSA 581-5(I)(a) and (I)(c). This issue is reserved for trial.

### C. The Oil & Gas Exemption Under Art. 581-5 § (Q)

Tex. Rev. Civ. Stat. Ann. art. 581-5(Q) (hereinafter, "Art. 581-5(Q)") exempts from the

registration requirements of the TSA transactions of the following nature:

> The sales of interests in and under oil, gas or mining leases, fees or titles, or contracts relating thereto, where (1) the total number of sales by any one owner of interests, whether whole, fractional, segregated or undivided in any single oil, gas or mineral lease, fee or title, or contract relating thereto, shall not exceed thirty-five (35) within a period of twelve (12) consecutive months and (2) no use is made of advertisement or public solicitation; provided, however, if such sale or sales are made by an agent for such owner or owners, such agent shall be licensed pursuant to this Act . . . .

Tex. Rev. Civ. Stat. Ann. art. 581-5(Q) (referred to as "TSA 5(Q)"). Stated differently, TSA 5(Q) "exempts interests in oil and gas leases from registration of two tests are met: (1) the total number of interests sold does not exceed thirty-five within a twelve month period; and (2) no use is made of advertisement or public solicitation." ***Paull v. Cap. Res. Mgmt., Inc.***, 987 S.W.2d 214, 217 (Tex. App.–Austin, 1999, pet. denied). The Court will address each of the elements under TSA 5(Q) in turn.

### 1. Total Number of Interests Sold Within a Twelve-Month Period

Neither party disputes that the Peterson Defendants satisfied the first element: the Peterson Defendants did not make more than thirty-five sales of oil and gas interests within a period of twelve consecutive months. (ECF No. 67, Ex. B, at 3). The parties, however, conflate number of sales with number of interests sold. Texas courts have interpreted TSA 5(Q) as requiring sellers to prove they have not sold more than 35 oil and gas interests in the past year. ***Paull,*** 987 S.W.2d at 217.

Peterson MSJ attaches two conveyances of oil and gas interest to TU. (ECF No. 67, Exs. G and H). Contained therein are a total of nine oil and gas leases. Plaintiffs' MSJ, however, attaches six exhibits (Ex. 2A, at Exs. A–D and F)[7] which list significantly more leases than the

---

[7] Exhibit 2A of Plaintiffs' MSJ has its own exhibits. Notably, Plaintiffs' MSJ lacks an Exhibit E. To avoid confusion, the Court will cite to these exhibits by referring first to Exhibit 2A, then to the exhibit attached to Exhibit 2A. For example, the Buy-Sell Agreement Between Suoco Oil Corporation, Daniels Energy and TitanUrbi21, LLC will be

nine Peterson Defendants attached. Some of the leases are contained in more than one of the five Plaintiff's exhibits. (*See, e.g.*, ECF No. 74, Ex. 2A, at Ex. A, at Ex. A, ¶ 5 and Ex. 2A, at Ex. B, at 1 (both conveying Clark Lease No. 05856)). Excluding the duplicates, the Court counts a total of twenty oil and gas leases conveyed in the multiple assignments and bills of sale. (*See* ECF No. 74, Ex. 2A, at Exs. A–D). The twenty oil and gas leases count is inconsistent with the twenty-four oil and gas leases listed in Exhibit A to the Buy-Sell Agreement Between Suoco Oil Corporation, Daniels Energy and TitanUrbi21, LLC. (*Id*., Ex. 2A, at Ex. F, at Ex. A). Moreover, because Exhibit 2A has its own Exhibits A, B, C, D, and F—but not its own Exhibit E—the Court is in no way confident the parties have presented all the interests conveyed to TU by Peterson Defendants in their summary judgment evidence. Because the Court cannot determine how many interests were sold in the Peterson Transaction, the issue of whether Petersons sold no more than thirty-five oil and gas interests in a year is reserved for trial. A genuine issue of material fact exists.

### 2. Public Solicitation

The parties do not allege the Peterson Defendants used advertisement to sell their oil and gas interests.[8] Therefore, the issue here is whether the Peterson Defendants used public solicitation in the sale of those interests.

The exemption prohibits using *public* solicitation. Courts in Texas required to presume that the legislature uses each word for a purpose and that no word is superfluous. ***Combs***, 340 S.W.3d at 439; *see also* Antonin Scalia & Bryan A. Garner, *supra*, at 174 (2012) ("If possible, every word and every provision is to be given effect . . . . None should be ignored."). Use of the word "public" in TSA 5(Q) suggests private discussions regarding the sale of an oil and gas interest may not

---

cited as ECF No. 74, Ex. 2A, at Ex. F. Moreover, some of the exhibits to Exhibit 2A contain their own Exhibit As, which the Court will cite as, for example, ECF No. 74, Ex. 2A, at Ex. F, at Ex. A.

[8] Moreover, Barry testified at his deposition that he was "not publicly advertising or soliciting the sale." (ECF No. Ex. 1, 21:15–17).

defeat the exemption. In *Nicholas*, a Texas state appellate court supported the trial court's finding that a seller of securities did not engage in public solicitation or advertising for purposes of an analysis under TSA 5(Q) when the purchaser of securities "initially sought out the [securities seller] after learning of the prospective drilling operations to be conducted by the [securities seller] through a fellow officer in the bank where [purchaser] worked." 687 S.W.2d 365, 368 (Tex.App.—Tyler 1984, writ ref'd n.r.e.). The *Nicholas* court differentiated between such "personal and private dealings" and "public solicitation." *Id.* In *Paull*, another Texas state appellate court relied on *Nicholas* to affirm the trial court's determination that no public solicitation occurred when a security seller presented information about an investment opportunity to a security investor at the investor's own request. 987 S.W.2d at 217. This Court finds the *Nicholas* distinction persuasive.

As a threshold matter, the Court observes that summary judgment evidence does not support concluding this solicitation was public in nature. Like in *Nicholas*, these transactions began because Scribner initiated private sale discussions with the Peterson Defendants. 687 S.W.2d at 368. Scribner phoned Barry on February 14, 2017. (ECF No. 67, Ex. E., 19:11–25). Scribner said he had contacted a relative of the Petersons who said the Petersons might be interested in selling oil and gas leases and put Scribner in contact with Barry. (*Id.*) Scribner then asked Barry if the Petersons would be willing to sell oil and gas leases and if he and Barry could reach an agreement. (*Id.*) Various individuals over the years approached the Peterson Defendants about buying their leases, but "the Peterson Defendants never sold any of the oil and gas leases they inherited" and "never advertised the leases for sale." (ECF No. 67, ¶ 8 (citing ECF No. 67, Ex. E, 19)). This limited private dealing cuts against a finding of public solicitation.

By rule, the Texas State Board of Securities (the "Board") provides that Texas Administrative Code §§ 109.13(a)-(c) and (j) (hereinafter, the Texas Administrative Code shall be

referred to as "TAC") applies to offerings under TSA 5(Q). This authority is derived from Tex.

Rev. Civ. Stat. Ann. Art. 581-5(T).[9] The rule issued by the Board provides:

> It is the intent of the State Securities Board that § 109.13(a)-(c) and (j) of this title (relating to Limited Offering Exemptions) apply to transactions made pursuant to the Securities Act, § 5.Q, and that the terms defined in § 109.13(a)-(c) and (j) of this title (relating to Limited Offering Exemptions) have the same meanings for purposes of § 5.Q as they do for the Securities Act, § 5.I.

7 Tex. Admin. Code § 109.14(a) (State Securities Board, Transactions Exempt From Registration).

TAC § 109.13, which addresses Limited Offering Exemptions, defines "public solicitation" for purposes of analyzing whether "use is made of public solicitation" in the sale of interests of oil and gas under TSA 5(Q). TAC § 109.13(a) titled "public solicitation, well-informed, and sophisticated investor" provides:

> The offer for sale or sale of the securities of the issuer would not involve the use of public solicitation under the Act, § 5.I, if the issuer, after having made a reasonable factual inquiry has reasonable cause to believe, and does believe, that the purchasers of the securities are sophisticated, well-informed investors or well-informed investors who have a relationship with the issuer . . . , and such purchasers acquire the securities as ultimate purchasers and not as underwriters or conduits to other beneficial owners or subsequent purchasers . . . The offer without advertising to a person who did not come within the class of persons described in this subsection does not alone result in public solicitation if the issuer had a reasonable cause to believe and did believe that such person fell within the class of persons described, and that such offer was not made indiscriminately.

7 Tex. Admin. Code § 109.13(a) (State Securities Board, Transactions Exempt From Registration).

In simplified terms, owner's[10] sale of a security would not involve "the use of public solicitation"

---

[9] Art. 581-5(T) provides that the TSA's registration requirements shall not apply to "[s]uch other transactions or conditions as the board by rule, regulation, or order may define or prescribe, conditionally or unconditionally." Tex. Rev. Civ. Stat. Ann. art. 581-5(T).

[10] The Court observes that TAC § 109.13(a) describes public solicitation in terms of "the securities of the issuer." 7 Tex. Admin. Code Ann. § 109.13(a). Defendants conceded they are not issuers of oil and gas securities. Despite using the word "issuer," the Court concludes the TSSB did not intend for TSA 5(Q)—which protects owners, not issuers—to be limited by the word "issuer." TAC § 109.14(a) specifically states that "[i]t is the intent of the State Securities Board that § 109.13(a)–(c) and (j) of this title … apply to transactions made pursuant to the Securities Act, § 5.Q, and that the terms defined in § 109.13(a)–(c) and (j) of this title … have the same meanings for purposes of § 5.Q as they do for the Securities Act, § 5.I." 7 Tex. Admin. Code Ann. § 109.14(a). Reading the definitions of public solicitation contained in TAC § 109.13 as only applying to issuers would render those same definitions meaningless for the owners

if it is made: (1) after a reasonable factual inquiry to sophisticated, well-informed investors, or (2) to well-informed investors who have a relationship with the owner or its principals that evinces trust and the purchasers do not acquire the securities for resale. *Id*. Moreover, the owner must both have reason to believe and in fact believe that the purchaser meets one of these criteria to satisfy the exemption. *Id*. The TAC provides guidance to assist in assessing whether an investor is "well-informed" and/or "sophisticated." 7 Tex. Admin. Code §§ 109.13(a)(1)–(2).

### i. Well-Informed Investor

In TAC § 109.13(a)(1), the Board provides considerations for determining if an investor is "well-informed," stating:

> The term "well-informed" could be satisfied through the dissemination of printed material to each purchaser prior his or her purchase, which by a fair and actual presentation discloses the plan of business, the history, and the financial statements of the [owner], including material facts necessary in order that the statements made, in light of the circumstances under which they are made, not be misleading.

7 Tex. Admin. Code § 109.13(a)(1).

Plaintiffs contend TU cannot be characterized as a "well-informed" investor because Peterson Defendants "*must* have, at a minimum, ensured that TU had sufficient information in order to make an informed investment decision about the transaction." (ECF No. 74, ¶ 43) (emphasis added). Plaintiffs then proceed to argue that the Board "provides a way to satisfy" the well-informed investor requirement: "by disseminating to the buyer printed materials containing the relevant financial and investment-related information." (*Id*.).

Peterson Defendants' MSJ argues, generally, that the oil and gas interests owned by the Peterson Defendants were not marketed to Plaintiffs, nor were they publicly advertised or solicited.

---

protected by TSA 5(Q). As such, the Court will interpret the definitions of public solicitation in TAC § 109.13(a) as applying to sales of securities by an "issuer" for purposes of TSA 5(I) but as applying to sales of securities by an "owner" for purposes of TSA 5(Q).

Instead, Scribner initiated all conversation with the Peterson Defendants—unsolicited—by calling Barry to discuss an interest in purchasing the Peterson Interests. (ECF No. 67, Ex. E., 19:11–25). None of the Peterson defendants had heard of Scribner, TU, or DALF before Scribner called their office in February 2017. (ECF NO. 67, Ex. B, at 3). Defendants argue TU's investments were the results of personal and private dealings between the parties and initiated by Plaintiffs' agent, Scribner. Peterson Defendants argue they "had reasonable cause to believe the purchasers of the leases were sophisticated and well-informed investors" because Scribner—as TU's agent— was well-informed because he identified himself as a petroleum engineer and touted how knowledgeable he was about the oil and gas industry, particularly in the Texas panhandle region. (ECF No. 67, ¶ 72 (citing ECF No. 67, Ex. E, at 20, 22, 59)).

The Court finds that Peterson Defendants "made a reasonable factual inquiry," and " had reasonable cause to believe," that Scribner was well-informed. 7 Tex. Admin. Code § 109.13(a)(1). The Court recognizes that Peterson Defendants did not disseminate printed material disclosing the plan of business, history, and financial statements of the Peterson Transaction. Plaintiffs' MSJ acknowledges that the Board "provides *a way* . . . to satisfy" the well-informed investor requirement." (ECF No. 73, ¶ 43) (emphasis added). The Court agrees with TU that TAC § 109.13(a)(1), does, indeed, give a decision-making body a method to analyze if an investor is "well-informed"; but this method is in no way the only method of making such a determination.

The Texas legislature instructs this Court that deciding if an investor is "well-informed" "*could* be satisfied through the dissemination of printed materials" informing the purchaser about the security it is buying. 7 Tex. Admin. Code § 109.13(a)(1) (emphasis added). "To determine whether the Legislature intended a provision to be mandatory or directory, we consider the plain meaning of the words used, as well as the entire act, its nature and object, and the consequences

that would follow from each construction." ***Helena Chemical Co. v. Wilkins***, 47 S.W.3d 486, 494 (Tex. 2001). The TAC does not direct that the Court shall or must use dissemination of printed materials as the sole criteria for concluding that an investor was "well-informed." The TAC merely provides how an investor *could* be deemed "well-informed." 7 Tex. Admin. Code § 109.13(a)(1). Therefore, the Court considers the plain meaning of the word "well-informed."

Here, Scribner, as agent for DALF and TU, informed Defendants that TU holds oil and gas leases for DALF to operate. (ECF No. 67, Ex. I, 76:12–77:5). On a repeated basis, Scribner held himself out as a petroleum engineer. (ECF No. 67, Ex. E, 22:13–15; ECF No. 67, Ex. I, 75:13–17). Scribner represented to Barry that he was familiar with production history, knew about the panhandle area, and had plans on how he was going to work with DALF to revitalize the wells to increase production. (ECF No. 67, Ex. E, 20:10–17, 22:8–25). At his deposition, Barry recounted the following phone call with Scribner:

> We had a lengthy conversation, and I tried to describe to Mr. Scribner what our oil and gas business was. And he kept interrupting me and telling me that, first of all, he had educated himself about our business from a review of the businesses on the railroad commission website. And then he informed be that he had two engineering degrees from Texas Tech, one of which I recall was a petroleum engineering degree. That he didn't need any of my help or my information. That he was perfectly capable of operating this business by himself. In fact, he told me that he and his father had a business, and I think they were principles of DALF Energy. I could be mistaken about that, but as I recall he told met that he and his father were in the oil and gas business already, and they felt certain that they could come up here and run the business better than we had been, and so he did not need any information from me about how to run it.

(ECF No. 67, Ex. E, 22:8–25). When Peterson Defendants offered to sell their oil and gas interests, Scribner conferred with Garza, the owner of DALF, and Carlos Sr., the then-owner and managing member of TU, to make the final decision to purchase the leases. (ECF No. 67, Ex. I, 55:7–58:3). Like the sellers in ***Nicholas***, the Defendants here did not seek out Plaintiffs as buyers for their oil and gas interest. 687 S.W.2d at 368. Rather, DALF and TU's agent Scribner contacted the Peterson

Defendants himself to ask if they had any oil and gas interests for sale. The culmination of facts and evidence leads the Courts to conclude the Martindale Defendants "made a reasonable factual inquiry" and "had reasonable cause to believe" that Scribner as TU's agent was well-informed.

What the Court lacks, however, is what the Peterson Defendants actually believed about whether TU was well-informed at the time of the transaction. TAC § 109.13(a) requires that the owner "has reasonable cause to believe, and does believe" the investor is well-informed. Because each word in a statute is presumed to have meaning and purpose, ***Combs***, 340 S.W.3d at 439, the Court concludes reasonable cause to believe and actual belief are separate elements which must be supported by their own evidence. The Court will not draw inferences about what an individual actually believed.

The Court will now consider whether Peterson Defendants reasonably and actually believed Plaintiffs were sophisticated investors.

### ii.    Sophisticated Investor

In determining if an investor is "sophisticated," "at least the following factors should be considered":

(A) The financial capacity of the investor, to be of such proportion that the total cost of that investor's commitment in the proposed investment would not be material when compared with his total financial capacity. It may be presumed that if the investment does not exceed 20% of the investor's net worth (or joint net worth with the investor's spouse) at the time of sale that the amount invested is not material.

(B) Knowledge of finance, securities, and investments, generally. This criteria may be met by the investor's purchaser representative if such purchaser representative has such knowledge, so long as such purchaser representative:

(i)     has no business relationship with the [owner];
(ii)    represents only the investor and not the [owner]; and
(iii)   is compensated only by the investor.

(C) Experience and skill in investments based on actual participation. This criteria

21

may be met by the investor's purchaser representative if such purchaser representative has such experience and skill, so long as such purchaser representative:

    (i)      has no business relationship with the [owner];
    (ii)     represents only the investor and not the [owner]; and
    (iii)    is compensated only by the investor.

7 Tex. Admin. Code §§ 109.13(a)(2)(A)-(C). In summary form, determining if an investor is "sophisticated" requires, at a minimum, consideration of the investor's financial capacity; the investor's knowledge, or the knowledge of the investor's purchaser representative, regarding finance, securities, and investments; and the investor's experience and skill. *Id*.

Plaintiffs argue Peterson Defendants did not have a reasonable "basis and actual belief that TU was a 'sophisticated' investor" because they did not "know[] and consider[] TU's financial capacity, how this particular transaction stood in relationship to TU's net worth, TU's knowledge of finance, securities, and investments, and TU's experience and skill in investments based on actual participation." (ECF No. 74, ¶ 44).

Peterson MSJ argues that Defendants believed Scribner, as Plaintiffs' agent, was a sophisticated investor. (ECF No. 67, ¶ 72). Peterson Defendants argue that Scribner touted his knowledge about the oil and gas industry generally as well as the Peterson leases specifically. Scribner told Barry in their initial conversation that he had reviewed the leases on the Railroad Commission website. (*Id*.). Scribner identified himself as a representative of TU and told Barry that TU had production going in other parts of Texas and was interested in getting a stake hold in the panhandle. (*Id*.). Peterson Defendants stress that when Barry tried to describe the leases to Scribner, Scribner interrupted Barry to say he holds a petroleum engineering degree from Texas Tech and did not need Barry's help or information. (ECF No. 67, ¶ 73). Peterson Defendants argue that Scribner even held himself out as a sophisticated investor who could improve production on

22

the wells. (*Id*.). Scribner struck Peterson Defendants as incredibly knowledgeable regarding oil and gas assignments, as evidenced by his multiple calls on the morning of February 21, 2017 with additional changes to the documents. (*Id*.). Lastly, Peterson Defendants argue that Scribner's access to and control over $650,000 renders him a sophisticated investor. (*Id*.).

The Court finds Peterson Defendants "made a reasonable factual inquiry" and "had reasonable cause to believe" that Scribner as TU's agent was sophisticated. Again, guidance on determining if an investor is sophisticated as described in TAC § 109.13(a)(2) are suggestions of "at least" what the Court "should" consider. Here, Scribner sent Barry two recent lease assignments he had for DALF to use as a guide for the Peterson Transaction. (ECF No. 67, Ex. E, 28:15–19) Scribner repeatedly identified himself as a petroleum engineer and stated that TU and DALF were engaged in the oil and gas business. (*Id*. at 22:8–25). Scribner assured Barry he had reviewed the leases on the Railroad Commission's website and bragged he could run the business by himself. (*Id*. at 22:8–25). Scribner asked Barry for the wiring information and, on the day of closing, Scribner told Barry he believed the money had been wired. (*Id*. at 29:2–4, 46:21–23), Barry opened his banking app on his phone and saw that $650,000 had been wired to his deceased mother's estate account. (*Id*. at 46:21–47:3). The Court finds, therefore, that the Peterson Defendants had reasonable cause to believe that Plaintiffs were sophisticated investors based on Scribner's, their agent, representations.

As with the well-informed investor element, the Court lacks evidence about what the Peterson Defendants actually believed regarding Plaintiffs' investment sophistication. Actual belief remains a fact issue for trial.

### 3.  Additional Considerations Under TAC § 109.13

Plaintiffs contend Peterson Defendants cannot claim the exemption under TAC § 109.13

23

because—in addition to failing to make a reasonable factual inquiry, having a reasonable cause to believe, and then actually believing that TU is a "well-informed" and "sophisticated" investor—they also did not satisfy the Board's further "limitations on disposition" requirement under TAC § 109.13(j).[11] Plaintiffs contend TAC § 109.13(j) imposes elements which Peterson Defendants must satisfy in order to claim exemption TSA 5(Q).[12] (ECF No. 74, ¶ 46).

Section 109.13(j) requires the owner[13] "of a security and any person acting on its behalf" to "exercise reasonable care to assure that the purchasers are acquiring the security as an investment." 7 Tex. Admin. Code § 109.13(j). "Such reasonable care *should* include, but not be limited to," five actions. *Id*. (emphasis added). "Should" is permissive. The Court interprets the five actions listed in TAC § 109.13(j)(1)–(5) as considerations that could constitute reasonable care. In other words, defendants seeking to claim TSA 5(Q) are not required to take the steps set out in TAC § 109.13(j)(1)–(5), though the Legislature and TSSB suggests owners do so to protect purchasers. All TAC § 109.13(j) requires is that owners "exercise reasonable care to assure that the purchasers are acquiring the securities as an investment." 7 Tex. Admin. Code § 109.13(j).

The Court concludes the Peterson Defendants satisfied their duty to exercise reasonable care. Scribner told Barry that Plaintiffs already produced oil and gas in other parts of Texas and wanted to move into the panhandle. (ECF No. 67, Ex. E, 59:9–15). Scribner told Barry he was

---

[11] Under § 109.14(a) of the TAC, "[i]t It is the intent of the State Securities Board that § 109.13(a)-(c) and (j) of this title . . . apply to transactions made pursuant to the Securities Act, § 5.Q . . . ." 7 Tex. Admin. Code § 109.14(a).

[12] Notably, Plaintiffs argue that Peterson Defendants failed to meet four additional considerations. (ECF No. 74, ¶ 46). TAC § 109.13(j) lists five—not four—additional considerations. Plaintiffs have not included consideration "(3) issuing stop transfer instructions to the issuer's transfer agent, if any, with respect to the securities, or, if the issuer transfers its own securities, making a notation in the appropriate records of the issuer." 7 Tex. Admin. Code Ann. § 109.13(j)(3).

[13] Like TAC § 109.13(a), subsection (j) addresses "issuer[s]." The Court concluded *supra* at note 9 that the clear legislative and administrative intent expressed in TAC § 109.14(a) supports reading the regulations included in TAC 109.13(a) as applying to both issuers of and owners of securities. TAC § 109.14(a) includes not only TAC § 109.13(a), but also subsections (b)-(c) and (j). 7 Tex. Admin. Code Ann. § 109.14(a). In order to be consistent, the Court will interpret the provisions of TAC § 109.13(i) as applying to issuers and owners.

certain he could run the oil and gas business better than the Petersons, suggesting Plaintiffs anticipated turning a profit. (*Id*. at 22:8–25). Scribner told Barry "there were several investors who were coming up with the money to buy the package" of wells. (*Id*. at 88:18–22). Because Scribner, as Plaintiffs' agent, repeatedly informed Barry that Plaintiffs intended to buy the Peterson oil and gas interests as an investment, the Court concludes Peterson Defendants reasonably exercised care to assure Plaintiffs were purchasing the securities as an investment.

### 4. Conclusion for the Oil & Gas Exemption Under Art. 581-5 § (Q)

The Court finds that the Petersons Defendants did not satisfy all of TSA 5(Q)'s elements. The Court cannot determine from the summary judgment evidence whether Peterson Defendants sold less than thirty-five oil and gas interests in the year prior to the Peterson Transaction. Though Peterson Defendants demonstrated they reasonably believed TU was a "well-informed" and "sophisticated" investor to establish non-use of public solicitation, Peterson Defendants did not carry their burden to show they actually believed TU was "well-informed" and "sophisticated" as required by the statute. Peterson Defendants satisfy TAC § 109.13(j)'s limitations on disposition.

As a matter of law, TSA 5(Q) only applies to "interest in or under an oil, gas, or mining lease, fees or title, or contracts relating thereto." Tex. Rev. Civ. Stat. Ann. art. 581-5(Q). The parties neither made arguments nor presented evidence addressing whether this exemption extends to the common stock sold to TU. This issue is reserved for trial.

 The Court DENIES both Plaintiffs' MSJ and Peterson MSJ on TSA 5(Q) grounds.

### D. Applicability of Oil and Gas Industry Exemption Under Section 109.14(d) of the Texas Administrative Code

Through the authority provided under TSA 581-5(T), TAC § 109.14(d)(1) provides an exemption not contained within the TSA itself:

In addition to offers and sales made pursuant to the Act, §5.Q, the State Securities Board, pursuant to the Act, §5.T, exempts from the securities registration requirements of the Act, §7, and the dealer and agent registration requirements of the Act, §12 and §18, the offer and sale of any interest in or under an oil, gas, or mining lease, fee, or title, or payments out of production in or under such leases, fees, or titles or contracts relating thereto by the owner or an agent for the owner when such offer or sale is made to persons and/or companies each of whom the owner or owner's agent shall have reasonable cause to believe and does believe meets the following criteria.

> (A) is engaged in the business of exploring for or producing oil, gas, or other minerals as an ongoing business or is engaged in the practice of a profession, or discipline, which is directly related to the exploration for, production of, refining of, or marketing of oil, gas, or other minerals such as the interest being sold; or

> (B) is a landman, drilling company, well service company, production company, refining company, geologist, geophysicist, petroleum engineer, earth scientist; or

> (C) is an executive officer of a company whose primary plan of business involves either subparagraphs (A) or (B) of this paragraph.

7 Tex. Admin. Code Ann. § 109.14(d)(1)(A)–(C).

In other words, if an owner of an oil, gas, or minerals security (or the owner's agent) offers for sale or sells the oil, gas, or mineral security to a person or company whom the owner (or the owner's agent) has reason to believe and actually believes fits certain criteria, then the transaction is exempt from the registration requirements of the TSA. *Id.* Those criteria are: (A) engagement in the business of exploring of or producing oil, gas, or other minerals in an ongoing manner, or engagement in the practice of a profession or discipline directly related to exploring for, producing of, refining of, or marketing of oil, gas, or other minerals; (B) status as a landman, drilling company, well service company, production company, refining company, geologists, geophysicist, petroleum engineer, or earth scientists; or (C) status as an executive officer for a company whose primary plan of business involves criteria (A) or (B). *Id.* Even if a person does not meet these criteria, the owner (or owner's agent) may not lose if the offer was "not made indiscriminately." *Id.* at (d)(2). Like other TSA exemptions, no binding case interprets relevant provisions of TAC § 109.14(d).

26

The TSA does not define "owner." Black's Law Dictionary defines "owner" as "[s]omeone who has the right to possess, use, and convey something." Black's Law Dictionary (11th ed. 2019). Because courts in Texas interpret a statute, 'first, by looking to the plain and common meaning of the statute's words,'" *Fitzgerald*, 996 S.W.2d at 865, the Court will adopt the Black's definition of owner.

Unlike owner, an owner's agent is defined to include:

> (A) officers, directors, and employees who are actively engaged in the day-to-day activities of the owner;
> (B) independent landmen, engineers, geologists, and consultants who have a contractual working relationship with the owner;
> (C) persons who meet the dealer registration requirements of the Securities Act, §12; and
> (D) persons who represent the owner in transactions exclusively with persons described in paragraph (1)(A)-(C) of this subsection.

7 Tex. Admin. Code § 109.14(d)(3) (West 2021).

The parties do not dispute that Suoco and Daniels Energy owned the oil and gas interests sold to TU. (ECF No. 67, Ex. E, 59:6–7). Barry signed the assignments in his representative capacity. (*See, e.g.* ECF No. 67, Ex. G, at 4 (signing as Suoco Oil Corporation secretary)). Scribner told Barry "he was a representative of TITANURBI, and that he was — he was in the process of trying to purchase production for that entity in the Texas panhandle." (ECF No. 67, 20:10–17). Scribner informed Barry that TU and DALF already had oil and gas leases in other parts of Texas. (*Id.*). The Court therefore finds that Barry, as representative of Suoco and Daniels Energy, reasonably believed TU was in the business of producing oil and gas.

The Court further finds that Barry, as representative of Suoco and Daniels Energy, actually believed TU was an industry participant. Barry and Scribner initially agreed to close the sale in Pampa, Texas at the Martindale law office. The two choose this location because Scribner was

already traveling to the Martindale law office "to close on Prairie Oil[14]" and to close on other interests.[15] (ECF No. 67, Ex. E, 29:10–25). When Barry was running late, Barry told Scribner he would meet Scribner at the Martindale law office, and Scribner told Barry he would close with Mr. Martindale first. (ECF No. 67, Ex. E, 31:22–32:3). In other words, Barry had actual knowledge that Scribner was prepared to close other oil and gas leases the same day in the same office building. The Court finds that purchasing oil and gas leases is directly related to exploring for, producing of, refining of, or marketing of oil, gas, or other minerals. Therefore, the Court concludes Peterson Defendants reasonably and actually believed TU was an oil and gas industry participant for purposes of TAC § 109.14(d)(1).

As a matter of law, TAC § 109.14(d)(1) only applies to "interest in or under an oil, gas, or mining lease, fee, or title, or payments out of production in or under such leases, fees, or titles or contracts relating thereto." 7 Tex. Admin. Code Ann. § 109.14(d)(1). The parties neither made arguments nor presented evidence addressing whether this exemption extends to the common stock sold to TU. This issue is reserved for trial.

The Court GRANTS Peterson MSJ and DENIES Plaintiffs' MSJ on the Industry Participant exemption created by TAC § 109.14(d) with respect to the oil and gas leases conveyed only.

### E. TU is Not Entitled to a Declaration that Suoco Violated the TSA

The Court finds that, as a matter of law, Suoco does not qualify for exemptions under TSA 5(C)(1) and 5(I). Genuine issues of material fact exist as to whether Suoco qualifies for an exemption under TSA 5(Q). The Court further finds, as a matter of law, that Suoco is entitled to

---

[14] Prairie Oil Company is a named defendant in this adversary lawsuit, categorized as one of the Martindale Defendants.
[15] The Court notes Barry recalled at his deposition that the other seller was Mrs. Anderson. (ECF No. 67, Ex. E, 29:15–17). The summary judgment evidence suggests, however, the woman was not Mrs. Anderson.

the exemption created by TAC 109.14(d), but only with respect to the oil and gas interests, not the common stock. Any declaration about whether Suoco violated the TSA is therefore premature.

### F. TU is Not Entitled to a Declaration that Jona Daniels Smith, Marilyn Crafton, and the Estate of Barry D. Peterson Violated the TSA

TU has requested a declaratory judgment that Barry, Jona, and Marilyn violated the TSA by selling an unregistered security not subject to any exemption. All three Peterson siblings were sued in their individual and representative capacities.[16] (ECF No. 77, Ex. A, at 2). All Peterson Defendants importantly filed a joint answer to the complaint. (Case No. 20-05049, ECF No. 13). Because Peterson Defendants jointly answered, the Court cannot reach the merits on whether Barry, Jona, and Marilyn in their personal capacity violated the TSA. Moreover, the parties have lumped the Peterson Defendants together in their arguments about liability. The issues of Barry's, Jona's, and Marilyn's liability both as representatives for Suoco and as individuals are reserved for trial.

### G. Misrepresentations, Omissions, and Fraud

The parties agreed at a status conference that resolution of the Plaintiff's TSA claims were a threshold issue. (ECF No. 105, ¶ 23). Still the Peterson Defendants sought summary judgment on the elements of common law fraud. (ECF No. 67, ¶¶ 92–95). "Plaintiffs do not contest partial summary judgment on the common law fraud claim asserted against the [Peterson] Defendants." (ECF No. 106, ¶ 23). The Court will not address any further arguments regarding misrepresentations, omissions, and fraud—whether statutory or common law. Those issues are reserved for trial.

### H. Plugging Liability

Like issues of misrepresentation, omissions, and fraud, issues of plugging liability are

---

[16] *Supra* note 2, at 3.

29

reserved for trial. The parties agreed that the Plaintiff's TSA claims were threshold issues, so the Court will not reach the plugging liability issue.

## I. Remedies

Those who sell unregistered securities in violation of the TSA are liable to the buyer either "for recission or for damages if the buyer no longer owns the security." Tex. Civ. Stat. Ann. art. 581-33(A)(1). "Recission of a contract is an equitable remedy used as a substitute for monetary damages when such damages would not be adequate." *Isaacs v. Bishop*, 249 S.W.3d 100, 109–110 (Tex. Ct. App. — Texarkana 2008, pet. denied) (citations omitted). Under the TSA, in other words, a party must choose between recission or damages.

Here, Plaintiffs seek to rescind the Peterson Transaction and "a specific dollar amount that would restore TU to its original position" based on a trial, if necessary. (ECF No. 74, ¶ 54). The Court will not grant Plaintiffs' request for recission, however, because there is no evidence indicating whether Plaintiffs currently own the securities. Until ownership is determined, recission is premature. Moreover, Plaintiffs have not established as a matter of law that Peterson Defendants cannot claim any TSA exemption, so no remedy is appropriate at this juncture.

Any other relief that is not expressly granted or denied herein is reserved for trial.

### CONCLUSION

For the foregoing reasons, it is ORDERED that Peterson Defendants' Motion for Summary Judgment (ECF No. 66) is GRANTED IN PART and DENIED IN PART as to a finding that Peterson Defendants are eligible for the exemption under Tex. Rev. Civ. Stat. ann. 581-5(Q);

It is FURTHER ORDERED that Peterson Defendants' Motion for Summary Judgment (ECF No. 66) is GRANTED IN PART and DENIED IN PART as to a finding that Peterson Defendants are eligible for the exemption under 7 Tex. Admin. Code Ann. § 109.14(d)(1);

It is FURTHER ORDERED that the Peterson Defendants' Motion for Summary Judgment (ECF No. 66) is DENIED on all other grounds;

It is FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment against Suoco Oil Corporation, Jona Daniels Smith, Marilyn Crafton, and Patricia Peterson, as the Independent Executor of the Estate of Barry Peterson (ECF No. 74) is GRANTED IN PART as to a finding that Peterson Defendants ineligible for the exemption under Tex. Rev. Civ. Stat. Ann. 581-5(C)(1);

It is FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment against Suoco Oil Corporation, Jona Daniels Smith, Marilyn Crafton, and Patricia Peterson, as the Independent Executor of the Estate of Barry Peterson (ECF No. 74) is GRANTED IN PART as to a finding that Peterson Defendants ineligible for the exemption under Tex. Rev. Civ. Stat. Ann. 581-5(I);

It is FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment against Suoco Oil Corporation, Jona Daniels Smith, Marilyn Crafton, and Patricia Peterson, as the Independent Executor of the Estate of Barry Peterson (ECF No. 74) is DENIED on all other grounds.

# # #

31